**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHARON THOMAS, | ) | Case No. 1:11 CV 02768 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| AT&T SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

This case is before the Court on Defendant AT&T Services, Inc.'s ("AT&T") Motion for

Summary Judgment on the claims of Plaintiff Sharon Thomas (ECF #29).  Plaintiff Thomas brings

claims of race discrimination[1] and retaliation under Ohio Revised Code. § 4112.02.[2]

Even when viewed in a light most favorable to Plaintiff, the evidence does not support her

claims that she was let go from her job because of the racist or retaliatory motives of others.

Instead, the record is replete with evidence that Plaintiff became so focused on her job title that she

neglected to fulfill her assigned responsibilities.  Plaintiff's unsatisfactory performance and her

---

[1]The Complaint does not allege claims under 42 U.S.C. § 1983.

[2]Plaintiff indicated during her deposition that she did not intend to pursue a gender discrimination claim.  Accordingly, the gender discrimination claim alleged in Count One  of the Complaint is dismissed.

1

combative behavior led to poor performance evaluations. As a result, Plaintiff was vulnerable when headcount reductions took place. There is no evidence that any factor, other than Plaintiff's own behavior and substandard performance, led to her discharge. For these reasons, more fully explained below, Defendants' Motion for Summary Judgment is GRANTED.

## I. FACTS

Plaintiff Sharon Thomas worked for Defendant AT&T or one of its predecessor companies from 1998 to 2008. From 1998 through 2004, Plaintiff worked in the IT department, first as an analyst, and then as a project manager. Although her projects varied, Plaintiff's job during the relevant time period involved working on teams that developed and maintained computer software programs, or applications, for internal users.

In the first part of 2004, Plaintiff was transferred to a "Team Lead" position, for the Mechanical Esoy Delivery System "MEDS." This position had been vacated by Marjorie Hunt, who was promoted from MEDS to a Senior Technical Director position with a different program. As the Team Lead within the MEDS group, Plaintiff initially reported to Senior Technical Director Charles Looney.

### A.   Plaintiff Experienced Problems Under Ms. Hunt In 2005 And 2006

Senior Technical Director Hunt assumed responsibility for MEDS work in 2005 when Mr. Looney transferred from the group. Although Plaintiff expressed interest in replacing Mr. Looney, the MEDS team was simply re-assigned to existing Senior Technical Director Hunt. Plaintiff remained in the Team Leader position, and began reporting to Ms. Hunt.

Ms. Hunt immediately experienced problems with Plaintiff's behavior and attitude. Plaintiff objected to Ms. Hunt's participation in her 2004 review meeting, after outgoing Director

Looney asked Ms. Hunt to sit in.  Further, Plaintiff ignored Ms. Hunt's communications.

Frequently, Plaintiff copied Ms. Hunt's boss on communications when Ms. Hunt thought it was

inappropriate to do so.

The cooperation and communication problems between Plaintiff and Ms. Hunt were

significant enough that Hunt mentioned them in the "Supervisor Comments" section for both

Plaintiff's 2005 mid-year and end-of-year performance reviews.  Ms. Hunt wrote:

> I would like to see Sharon become more of a team player and be
> more cooperative with others and supervision as shown on
> 1/19/2005 when she refused to provide her supervisor with her
> NCS in addition to her not wanting her then new supervisor to
> participate in her 2004 EOY A&D review.

Similarly, under the "Areas for Development" section in Plaintiff's 2005 end-of-year

performance review, Ms. Hunt stated that Plaintiff needed to "[d]evelop a positive relationship

with others and team members by being more cooperative to supervision and others."

Also in 2005, while reporting to Ms. Hunt, Plaintiff was notified by the Corporate

Information Security Department of an audit of the MEDS software application.  It was

determined that the application was non-compliant because it did not require users to enter a log-

on id and password to access the system.  The MEDS Team was responsible for bringing the

application into compliance.  Although these types of compliance issues were typical and did not

indicate any wrongdoing by any party responsible for the software application, Plaintiff blamed

former Team Leader Hunt for the non-compliance and the extra work Plaintiff had to complete to

correct the issue.

On August 23, 2006, after receiving a mid-year performance review from Ms. Hunt,

Plaintiff contacted Hunt's direct supervisor, Steve Pierson, to challenge the review.  In an email to

3

Mr. Pierson, Plaintiff took issue with her rating of "Met Some" and disagreed with Ms. Hunt's comments in the "Areas for Development" category, which were the same comments that had been included in Plaintiff's 2005 performance reviews. Plaintiff alluded to the CIS compliance audit as having some bearing on the comment about needing to support supervision more.[3]

Plaintiff was transferred from MEDS to the Centralized Development Team by August 2006, as part of an effort to reduce staffing levels. CDT would serve as an internal pool of IT employees who could be assigned to internal IT projects. The transfer was a lateral transfer. Plaintiff's compensation and job grade level (Level 2) remained the same.

### B. Plaintiff Experienced Problems Under Ms. LaFaver In 2007

In January 2007, the CDT group assigned Plaintiff to the Lightspeed project under Senior Technical Director Jeanne LaFaver. Ms. LaFaver reported to Executive Technical Director Sandra Baker.

Plaintiff rapidly grew disenchanted with her position on the Lightspeed project because she was not promoted to the Senior Technical Director role or designated as a project Team Lead. Ms. LaFaver assigned the two Senior Technical Team Lead roles in her group to Melvyn Jones (Caucasian male), who had worked in a Team Lead position since at least 2002, and Shaphane Crocheron (African American female), who had also been in a Team Lead position since at least 2002.

---

[3]In her Complaint, Plaintiff portrays the August 23, 2006 e-mail communication to Mr. Pierson about her 2006 mid-year rating as a reporting against Ms. Hunt for "non-compliance issues" based on Hunt having allegedly "falsified documentation in an annual . . . CIS audit." Plaintiff alleges that Hunt's mid-year 2006 performance review rating was a form of retaliation against Plaintiff for reporting Ms. Hunt's alleged compliance violation. Yet, the 2006 mid-year rating occurred before Plaintiff made any alleged report of CIS violations to Mr. Pierson in August 2006. In fact, the 2006 mid-year rating was what triggered Plaintiff's alleged "report" to Pierson.

4

Although Plaintiff was not given the Team Lead title, she remained at a level 2 job grade. This was the same job grade assigned to the Team Lead title.

Ms. LaFaver documented in detail the evolving issues she experienced with Plaintiff. Plaintiff was originally assigned to Mr. Jones' team and tasked with preparing weekly reports that were intended to be circulated to upper management.  Plaintiff struggled with these reports, submitting untimely reports that contained errors.  Plaintiff was transferred to work with Ms. Crocheron's team around April 2007.

Even though Ms. LaFaver advised Plaintiff that Ms. Crocheron was to be her Team Lead and would be assigning Plaintiff responsibilities, there were multiple incidents when Ms. LaFaver had to intervene in disagreements between Plaintiff and Ms. Crocheron or affirm work assignments that Ms. Crocheron gave to Plaintiff.

Plaintiff did not fully understand the purpose of the Lightspeed group, and could not be relied upon to complete a project without significant oversight.  In June 2007, Ms. LaFaver asked Plaintiff to review the "user experience" on competitor websites.  Ms. LaFaver anticipated the project would take a couple of weeks.  Instead, it took Plaintiff over a month, during which Ms. LaFaver had to meet with Plaintiff several times to explain and clarify the assignment.  Instead of reviewing user experience on websites, Plaintiff was comparing competitor pricing.  Ms. LaFaver's Lightspeed group did not set pricing for the product and had no input on pricing.

In addition to the unreliability of her work product, Plaintiff engaged in deceptive and insubordinate conduct.  On September 27, 2007, Ms. Crocheron and Ms. Lafaver learned that Plaintiff had planned to take 13 consecutive days off of work (from October 1 through October 17) without consulting either of them.  Plaintiff planned to use voluntary time-off without pay

5

("VTO") for some of the days. Company policy requires employees seeking to use VTO time to obtain advance approval. Plaintiff contends that she applied for VTO leave within the time limitation set by company policy. Nonetheless, Ms. LaFaver denied the VTO time because there was not enough time to arrange coverage for Plaintiff's responsibilities.

After Plaintiff's VTO time in October was denied, Plaintiff unilaterally decided to work from home. In response, Ms. LaFaver specifically instructed Plaintiff that going forward Plaintiff was to notify Ms. LaFaver in advance when working from home. On October 3, 2007, while Plaintiff was supposed to be working from home, both Ms. LaFaver and Ms. Crocheron tried to reach Plaintiff during the day, but were unable to contact her. Ms. LaFaver requested that the Corporate Information Security department checked when Plaintiff logged onto the network that day. They reported that Plaintiff had not logged onto the network until approximately 9 p.m. that evening. Plaintiff does not contest that she could not have effectively performed her work without accessing the company's computer networks and programs.

On October 15, 2007, Plaintiff again unilaterally decided to work from home and again failed to respond to messages and phone calls. Following this incident, Ms. LaFaver provided Plaintiff with a written list of work expectations. Less than a week after Ms. LaFaver communicated these expectations to Plaintiff, Plaintiff could not be found at work and failed to attend two meetings with her Team Lead. Plaintiff failed to provide any explanation to Ms. LaFaver. As a result, Ms. LaFaver issued Plaintiff a formal Written Warning. Plaintiff refused to sign the Written Warning. Moreover, in an unequivocal show of unprofessionalism, Plaintiff scribbled all over the Written Warning. Plaintiff refused to discuss the Warning with Ms.

LaFaver, stating that she was seeking to "repeal' the Warning and would not comment on or discuss it while other "investigations" were pending.

On November 5, 2007, Lisa Maysey, the company's Hotline investigator, contacted Ms. LaFaver to advise her that Plaintiff had made an Ethics hotline complaint relating to Plaintiff's prior supervisor but that the case was closed and Ms. LaFaver should continue working with her assigned Human Resources ("HR") manager to address Plaintiff's insubordination and performance issues.

Plaintiff continued to use the fact that she had filed a Hotline complaint, and later a Charge of Discrimination with the Ohio Civil Rights Commission, as an excuse to ignore communications from her supervisors Ms. LaFaver and Ms. Crocheron.  There was never a finding that Ms. LaFaver had engaged in illegal discrimination or retaliation against Plaintiff.

### C.     Remedial Efforts Did Not Improve Plaintiff's Work Product Or Relationships

Beyond the difficult interpersonal issues that continued to exist, Plaintiff's substantive work continued to be a problem.  In November 2007, Ms. LaFaver asked Plaintiff to focus on one assignment that had fallen behind schedule.  Plaintiff failed to meet several deadlines for this assignment even though it was the only responsibility that Ms. LaFaver assigned to Plaintiff for the entire month of December.  By January 2008, Ms. LaFaver concluded that the assignment was still not complete or correct despite multiple attempts to explain to Plaintiff what was expected.

Thereafter, Ms. LaFaver worked with her Employee Relations manager in HR to develop a Performance Improvement Plain ("PIP").  In May 2008, Ms. LaFaver sent Plaintiff a copy of the PIP document and scheduled a meeting with Plaintiff to discuss it.  However, Plaintiff refused to

meet with Ms. LaFaver regarding the PIP.  Plaintiff's position was eliminated through downsizing before the PIP could ever be officially implemented.

### D.     Plaintiff's Position Was Eliminated

During 2008, there were multiple rounds of head-count reductions within the Consumer Information and Technology business unit in which Ms. LaFaver and Plaintiff worked.  AT&T refers to this process as a "surplus."  The surplus process that impacted Plaintiff's position was finalized in June 2008.  The business unit was directed to reduce 64 positions due to financial shortfalls and geographic rationalization.

Executive Director, Sandra Baker, was asked to provide ratings information for an affected work group of employees under her chain of command that included Plaintiff and Tom Pearce, another employee.  Mr. Pearce's 2007 end-of-year performance rating was "meets" expectations, while plaintiff's was "below" expectations.  While Ms. Baker was aware of Plaintiff's performance issues based on communications with Ms. LaFaver, she was not aware of any performance problems with Pearce.  Ms. Baker rated Mr. Pearce higher based on their recent performance evaluations and her assessment of whose work.  Because Mr. Pearce was co-located with the software users that he supported and engaged in direct, hands-on work with them, his position was more critical.  Ms. LaFaver had no input in the surplus process.

In October 2008, a second round of surplus further affected Ms. LaFaver's Lightspeed team.  The positions of Senior Business Manager Susan Bedingfield and Executive Director Sandra Baker were eliminated.  Both Ms. Bedingfield and Ms. Baker are Caucasian females.

By the end of 2008, a third surplus impacted Ms. LaFaver's Lightspeed team.  This round eliminated the following positions under Ms. LaFaver: Senior IT Analyst Mike Wolf (Caucasian

8

male); IT Analyst Richard Earnhardt (Caucasian male); Senior IT Analyst Timothy Franczak (Caucasian male); Senior Technical Team Lead Shaphane Crocheron (African American female); and IT Analyst Tracey Barry (African American female).

Following the surplus of Plaintiff's position, no further attempts were made to implement Plaintiff's PIP.  Under standard company policy for persons designated as surplus, Plaintiff was given the option to stay on payroll for a 60-day period and to apply internally for open positions within the company.  At the end of the 60-day period, if Plaintiff was not successful in obtaining another position, she could accept the company's severance package in exchange for signing a release of claims.  Plaintiff did not obtain another position during her 60-day surplus period.  Therefore, her employment with AT&T was terminated on August 15, 2008.  Plaintiff chose not to execute the release of claims and receive severance.

### E. Plaintiff's Hotline Complaints And Charge Of Discrimination

#### 1. August 2007 Hotline Complaint

While working under Ms. LaFaver, Plaintiff filed three complaints with AT&T's internal Compliance Hotline (the "Hotline").  The first was filed on August 30, 2007, and related to Plaintiff's concerns that the transfer to CDT was a form of retaliation for reporting Ms. Hunt in connection with the non-compliance issue with the MEDS software.

The Hotline complaint was assigned to HR Manager Lisa Maysey for investigation.  Maysey compiled a detailed summary of her investigation, which involved review of data confirming that Plaintiff did not experience any impact to pay or job grade level as part of the transfer to CDT; an interview with Hunt's supervisor, Steve Pierson, to gain an understanding of the underlying situation between Hunt and Plaintiff; and several conversations with Plaintiff.

Notably, during their conversations, Plaintiff told Maysey that she did not intend for retaliation to be the focus of her complaint.  Rather, she wanted to know how she could have handled things differently with the Hunt/Pierson situation and was looking to move to another team where she could achieve a lead role.

Ms. Maysey's notes indicate that she found that Plaintiff continued "to exhibit confrontational behavior with her existing Team Lead."  Maysey also found that the opinion that Plaintiff "needs to develop some leadership dimension skills before she can resume a team lead role" was shared by several fo Plaintiff's supervisors, both past and present.  The investigation did not uncover any violations or retaliation.

### 2.     April 2008 Hotline Complaint

Plaintiff made her second Hotline complaint on April 30, 2008, claiming that since her Hotline complaint in 2007, Ms. LaFaver had been discriminating and retaliating against her. Plaintiff refused to provide any details to substantiate her claims until she was contacted in person. Ms. Maysey was also assigned to investigate this complaint.  When Maysey spoke with Plaintiff, Plaintiff refused to discuss her allegations verbally, wanting instead to communicate with Maysey in writing.  Plaintiff eventually provided Maysey with a written list of acts she believed to be racially discriminatory and/or retaliatory.  Although several of the allegations on Plaintiff's list were already addressed in connection with the first Hotline complaint as well as an external complaint that Plaintiff filed with the Ohio Civil Rights Commission (e.g. not getting a team lead role, criticism of her work, the written list of expectations and the written warning), Ms. Maysey investigated the new allegations raised in Plaintiff's communication, including allegations that; Ms. LaFaver was given the Senior Technical Director position instead of Plaintiff based on race;

10

Ms. Lafaver passed Plaintiff over for a temporary Level 2 Team Lead position in January 2008; and Ms. LaFaver issued a PIP that included false accusations about Plaintiff's work performance.

Ms. Maysey's investigation of these allegations revealed that Ms. LaFaver had been transferred to the Senior Technical Director position in Lightspeed as a lateral transfer in connection with a talent re-deployment and that Plaintiff could not have applied for the position because it was not a posted position.  With respect to the  temporary Team Lead position in January of 2008, Ms. Maysey learned that Ms. LaFaver designated Nina Browning the "go-to" person on Ms. Crocheron's team while Ms. Crocheron was on leave at the beginning of 2008. However, Ms. Browning had not received a title change, promotion, or any change in pay in connection with that situation.  Ms. Maysey confirmed that Ms. LaFaver had coordinated with and received approval from the HR Department for the PIP but had deferred implementation of the PIP at the request of the HR Department.

Although not specifically raised as an issue by Plaintiff, upon learning that Plaintiff's position had been designated as surplus, Ms. Maysey spoke with the HR manager involved in the surplus process to verify that nothing retaliatory had occurred during that process.

### 3.    July 2008 Hotline Complaint

Plaintiff filed a third hotline complaint on July 31, 2008.  She alleged that an email from Ms. LaFaver inquiring whether Plaintiff had found another job or when her last day would be in connection with the surplus was harassing and offensive.  The investigation of this complaint was subsumed within the investigation fo the April 2008 Hotline complaint.

11

4.     **November 2007 Charge of Discrimination**

In addition to her internal Hotline complaints, Plaintiff also filed an external Charge of Discrimination with the Ohio Civil Rights Commission, which was delegated to the Equal Employment Opportunity Commission ("EEOC") for investigation. Cheryl O'Hara, a member of AT&T's Human Resources department, was responsible for investigating and responding to the Charge, which overlapped with Plaintiff's hotline complaints. On January 23, 2009, the EEOC issued a no probable cause finding and a "right to sue" letter to Plaintiff.

## II. LEGAL STANDARD

Defendants have moved under Rule 56 of the Federal Rules of Civil Procedure for summary judgment on Sharon Thomas' claims against them. Plaintiff has responded, and Defendants have replied. Thus, the Motion for Summary Judgment is ripe for review. In ruling on the Motion, the Court views the record in a light most favorable to the non-movant in accordance with Rule 56.

Summary judgment under Rule 56 is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show "that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed .R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists," and the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Vaughn v. Lawrenceburg Power Sys*., 269 F.3d 703, 710 (6th Cir. 2001). When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

12

With regard to the non-moving party's obligation to set out specific facts showing a genuine issue for trial, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted).  Rather, "Rule 56 allocates that duty to the opponent of the motion, which is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Id.*

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87. The Court's inquiry, therefore, asks whether reasonable jurors could find by a preponderance of the evidence that the non-moving party is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III.  DISCUSSION

#### A.      Plaintiff's Race Discrimination Claims Fail As A Matter Of Law

Plaintiff must demonstrate four factors to establish a prima facie case of race discrimination.  Plaintiff must demonstrate that she: (1) is a member of a protected class; (2) experienced an adverse employment action; (3) was qualified for her position; and (4) was replaced by a person from outside her protected class, or received different treatment than employees outside of the protected class for the same or similar conduct.  *Tally v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citations omitted).

If Plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to AT&T to articulate a legitimate, non-discriminatory reason for the employment decisions at

issue. *McDonnell Douglas v. Green*, 411 U.S. 792, 804 (1973). Once Defendants meet this burden of production, Plaintiff must then prove AT&T's reasons are a pretext for race discrimination. "The ultimate burden of persuasion remains with the plaintiff to prove that the employer's reasons were a pretext for discrimination and that the employer intended to discriminate on the basis of race." Thurman v. Yellow Freight Sys., 90 F.3d 1160, 1166 (6ᵗʰ Cir. 1996) (emphasis in original), citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

Plaintiff's race discrimination claim is premised on three categories of alleged adverse employment actions: (1) Ms. LaFaver's treatment of Plaintiff; (2) the surplus of Plaintiff's position; and (3) Plaintiff's failure to be selected for various jobs to which she applied internally while still working at AT&T. Plaintiff cannot make a prima facie case of race discrimination on the basis of any of these actions.

1. **Plaintiff Cannot Establish A Prima Facie Case Of Race Discrimination Based On Ms. LaFaver's Actions**

a. **Plaintiff Cannot Demonstrate An Adverse Employment Action**

First, Ms. LaFaver's actions toward Plaintiff do not constitute adverse employment actions. An adverse employment action is defined in the Sixth Circuit as "'a materially adverse change in the terms of [one's] employment.'" White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 797 (6th Cir.2004) (en banc) (quoting Kocsis v. Multi–Care Mgmt., Inc., 97 F.3d 876, 885 (6th Cir.1996)). Such a materially adverse action includes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id*. at 798 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (internal quotation marks removed)). The employment action

14

must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."

*Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir.2000) (internal quotation marks

omitted); see also id. at 462 (" [D]e minimis employment actions are not materially adverse and,

thus, not actionable.").

Discipline, heightened supervision of Plaintiff's work, and the allocation of work duties by

Ms. LaFaver that Plaintiff finds objectionable do not rise above the *de minimis* acts that are

insufficient to constitute adverse employment actions because they did not result in firing,

demotion, suspension, loss of pay or loss of other benefits. Plaintiff complaints of nothing more

than inconvenience, alteration of job responsibilities, and a bruised ego, none of which approach

the level of an adverse employment action. *White*, 364 F.3d at 797 (6th Cir. 2004) (citations

omitted).

### b.  Plaintiff Cannot Show That She Was Qualified For Her Position Or Any Other Position At AT&T

Further, Plaintiff cannot show that she was "qualified" for any position she occupied or

aspired to as she must do to establish a prima facie case.  To be "qualified" for a position, a

plaintiff must have performed "at a level which met his employer's legitimate expectations."

*McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir. 1990); *Jackyln v. Schering-Plough*

*Healthcare Prods. Sales Corp.* 176 F.3d 921, 929 (6th Cir. 1999).  The evidence here is

overwhelming that Plaintiff consistently failed to meet legitimate expectations for her positions by

being unresponsive to work communications, failing to obtain approval to work from home,

failing to log onto the company network when she claimed to have been working from home

(Plaintiff does not contest that she needed to be logged on to the company network to do her job);

15

failing to understand assignments, failing to complete work in an accurate or timely manner, and failing to attend meetings as requested by her supervisor.  None of Ms. LaFaver's expectations were extraordinary, but rather were typical employer expectations.  Moreover, it bears special acknowledgment that Ms. LaFaver was not the only one to find Plaintiff's performance lacking.  Both Ms. Hunt and Ms. Crocheron – who are the same race as Plaintiff – experienced these issues with Plaintiff.

As a matter of law, Plaintiff cannot create a genuine issue of material fact with respect to whether she was performing satisfactorily merely by relying on her own subjective assessment of her performance.  *McDonald*, 898 F.2d at 1160.  Thus, Plaintiff has provided no evidence to establish the "qualified" element of a prima facie case of discrimination.

### c.      <u>Plaintiff Was Not Similarly-Situated To Others On Her Team</u>

Plaintiff also cannot show that Ms. LaFaver treated her differently than similarly-situated employees outside of Plaintiff's protected class.  To be "similarly-situated," the persons to who Plaintiff compares herself must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Clayton v. Meijer, inc.*, 281 F.3d 605 (6th Cir. 2002).  There simply is no evidence that any employee on Ms. LaFaver's team was similarly-situated to Plaintiff, because there is no evidence whatsoever that anyone else engaged in the same combative, insubordinate, disruptive, and unprofessional behavior as Plaintiff. Nor is there any evidence that any other employee was unreachable while

working at home, failed to log into the company system during work hours,[4] or submitted work that was untimely and deficient.

Further, Ms. LaFaver had legitimate, non-discriminatory reasons for her actions. The list of expectations given to Plaintiff, the Written Warning, the critical evaluations and the attempt to place Plaintiff on a PIP were all efforts to remedy specific, documented performance problems. Plaintiff has not demonstrated that Ms. LaFaver's concerns about Plaintiff's performance were a pretext for race discrimination. Ms. LaFaver had other African American employees on her team, such as Ms. Crocheron and Ms. Barry, and even made Ms. Crocheron one of the two Team Leads. Plaintiff could not identify any instance where Ms. LaFaver made racist remarks to her. Plaintiff has presented no evidence of pretext.

### 2. Plaintiff Cannot Establish Race Discrimination Based On Her Surplus

Plaintiff's prima facie case for race discrimination based on the surplus of her position fails for some of the same reasons the claim based on Ms. LaFaver's treatment of Plaintiff fails: (1) Plaintiff was not qualified for her position because she was not meeting the legitimate expectations

---

[4]Plaintiff attempts to blame Ms. LaFaver for her failure to log into the system while working from home on October 3, 2007, based on actions that Ms. LaFaver subsequently took on October 19, 2007 to revoke Plaintiff's remote access and prevent Plaintiff from working from home without approval. There is no way that the revocation of Plaintiff's remote access on October 19 can explain Plaintiff's failure to log in on October 3rd. Plaintiff had not provided any plausible explanation for her failure to log in.

17

of her employer;[5] and (2) Plaintiff was not replaced by, or treated differently than, similarly-situated persons outside of her protected class.

Further, Plaintiff cannot demonstrate that she was replaced following the elimination of her positions.  Instead, Plaintiff's work was distributed to three existing employees, two of whom were in Plaintiff's same protected class: Ms. Crocheron (African American), Tracy Barry (African American), and Nina Browning (Caucasian).  An existing employee's assumption of a terminated co-worker's job duties does not constitute replacement. Rather, a person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.  *Grosjean v. FirstEnergy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003); *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).

Even if Plaintiff could make a prima facie case based on her surplus, which she cannot, AT&T had legitimate, non-discriminatory reasons based on its business judgment that headcount needed to be reduced.  When AT&T compared Plaintiff to the other employee in her affected work group (Tom Pearce), his position was more critical to retain.  There is no evidence that this was just a pretext to discriminate against Plaintiff based on her race.  Indeed, several Caucasian employees from Plaintiff's team were also designated surplus just months after Plaintiff.

---

[5]Plaintiff argues that there is "little question" as to her qualifications.  She points generally to her experience in the broad field of Information Technology and her educational background (only some of which was in the field of Information Technology).  Such evidence does not speak to her qualifications to perform the specific jobs she was assigned while working under Marjorie Hunt and Jeanne LaFaver during 2005 through 2008.  Nor does Plaintiff's evidence regarding her educational credentials establish that she was performing at a level that met her employer's legitimate expectations from 2005 to 2008.  *Jacklyn*, 176 F.3d at 929.  Significantly, in support of her qualifications, Plaintiff points only to (unauthenticated) favorable job evaluations pre-dating 2005, while ignoring less favorable evaluations in subsequent years.  She also utterly fails to address many of the performance issues documented by Ms. LaFaver.

Plaintiff's Opposition contains no pretext analysis, let alone evidence to demonstrate a triable issue of fact for a jury.

> **3.**    **Plaintiff Cannot Establish Race Discrimination Based On Her Failure To Be Promoted Or Hired Into Other Positions**

As an initial matter, Plaintiff simply cannot establish that she was rejected for the other positions to which she applied because of her race because there is no evidence that the persons making the decisions were aware of Plaintiff's race. *Johnson v. Northwest Airlines*, 53 F.3d 331 (6th Cir. 1995). For this reason alone, Plaintiff's claim of race discrimination based on the failure-to-hire allegations fails as a matter of law.

Plaintiff also fails to show that she applied and was qualified for the positions on which she bases her claim. Plaintiff has not specifically identified which positions she alleges she was denied based upon race. Apparently, she is claiming that any and all positions she was denied were based upon race. The evidence does not support her claims. To the contrary, there is no evidence on record to show that Plaintiff was qualified for any other job for which she might have applied at AT&T.

Although Plaintiff did not formally apply for them, there are some specific positions about which Plaintiff complains, including: Ms. LaFaver's Senior Technical Director position and Mel Jones' and Shaphane Crocheron's Team Lead positions. In each of these situations, the person placed in the job had more experience than Plaintiff and, thus, was not similarly situated to Plaintiff because they had superior qualifications. *See Hicks v. SSP America, Inc.*, No. 10-4156, 2012 WL 3140243, *3 (6th Cir. Aug. 3, 2012).

19

Here, Plaintiff never held a Senior Technical Director position, but at most served in an "acting" Senior Technical Director role for about a year.  Ms. LaFaver, on the other hand, had held the title of Senior Technical Director for seven years when she was transferred to Lightspeed in 2007.[6]  With respect to Ms. LaFaver's selection of Team Leads, she designated Mel Jones and Shaphane Crocheron for those roles before she met Plaintiff or was aware that Plaintiff had an interest in such a role.  Ms. Jones had been specifically recommended for Team Lead by CDT.  Also, Mr. Jones and Ms. Crocheron had worked as Team Leads since at least 2002, giving them more years of experience than Plaintiff, who had only had such a position since 2004.[7]  Moreover, Ms. Crocheron is the same race as Plaintiff; comparisons between these two cannot satisfy the prima facie case for race discrimination.  Indeed, the fact that Ms. LaFaver placed Ms. Crocheron in one of the two Team Lead positions undermines any allegation that Ms. LaFaver acted with racial animus.

Based on the undisputed evidence, Plaintiff's claim for race discrimination fails as a matter of law.  Summary judgment is awarded in favor of Defendants on this claim.

---

[6]Likewise, Judith Greenwald had prior experience in a Senior Technical Director position at the time Ms. Baker selected her for a Senior Technical Director position.  Plaintiff did formally apply for the position awarded to Ms. Greenwald.

[7]Plaintiff assumes without discussion or pointing to any evidence that she was similarly situated to Melvyn Jones based on the fact that both were Level II employees and worked in the same group as Ms. LaFaver.  Among other deficiencies in this argument, Plaintiff ignores that Mr. Jones did not demonstrate the performance and attitude problems that Plaintiff exhibited.  Taking Plaintiff's sub-par performance and bad behavior into consideration, she and Mr. Jones were not similarly situated.

20

## B.       Plaintiff's Retaliation Claims Fail As A Matter Of Law

Plaintiff claims AT&T retaliated against her in violation of Ohio R.C. § 4112.02 for internal and external complaints she made about her supervisors while working at AT&T.  "Ohio law prohibits retaliating against an employee who has opposed any unlawful discriminatory practice or has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under R.C. 4112.01 through 4112.007."  R.C. 4112.02(I).

Retaliation claims based on circumstantial evidence (such as the ones asserted here) follow the *McDonnell Douglas* framework, which requires the demonstration fo a prima facie case, a legitimate and non-discriminatory reason for the adverse employment action, and pretext.  *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 502 (6th Cir. 2009).  This framework also applies to retaliation claims under R.C. § 4112.  *Greer-Burger v. Temesi*, 879 N.E.2d 174, 180 (Ohio 2007).  To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected activity; (2) her employer knew that she engaged in the protected activity; (3) her employer subsequently took an adverse employment action against her; and (4) the adverse employment action was causally related to the protected activity.  *Blackshear v. Interstate Brands Corp.*, No.10-3696, 2012 WL 3553499, 5 (6th Cir. 2012) (citing *Ladd*, 552 F.3d at 502).

Plaintiff cannot prove the elements to establish a prima facie case of retaliation.  Further, even if Plaintiff could establish a prima facie case of retaliation, AT&T had legitimate business reasons for each decision made with respect to Plaintiff, which Plaintiff cannot demonstrate to be a pretext for retaliation.

1.      **Plaintiff Did Not Engage In Protected Activity Before August 2007**

Construing the facts in a light most favorable to Plaintiff, the earliest possible date that Plaintiff engaged in protected activity is August 30, 2007, when she made a complaint to the company's Hotline.  Plaintiff's reporting of Ms. Hunt's alleged compliance issue, whether a technical violation of company policy or not, did not involve either opposing a discriminatory practice that is unlawful under R.C. Chapter 4112, or participating in an investigation, proceeding or hearing relating to any discriminatory practice under R.C. Chapter 4112.  Likewise, Plaintiff's complaint to Pierson in August 2006 about her mid-year performance rating from Ms. Hunt and the suggestion that the rating was unfairly based on reporting the compliance issue also does not constitute protected activity.  Neither the compliance issue nor Plaintiff's complaint about her 2006 mid-year review raised issues about race, sex or any other form of discrimination prohibited under R.C. Chapter 4112.

In *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir. 1989), the court held that the plaintiff's letter to human resources was not protected activity because the plaintiff was not contesting any unlawful employment practice but instead was contesting the correctness of a decision made by his employer and suggesting the focus of the company's inquiry should be on his supervisor.  Plaintiff's complaints about the compliance issue and her 2006 mid-year review are no different than the complaints at issue in the *Booker* case.  Thus, any activity that pre-dates Plaintiff's August 2007 Hotline complaint cannot, as a matter of law, serve as the basis for Plaintiff's retaliation claim.

Accordingly, the Court disregards the following allegations when considering Plaintiff's retaliation claim: (1) Plaintiff's transfer from Ms. Hunt's MEDS group to CDT in July 2006; (2)

22

the alleged negative comments of Ms. Hunt in Plaintiff's 2006 mid-year performance review in August 2006; (3) Plaintiff's title change to Project Manger while in CDT in late 2006; (4) Plaintiff's alleged failure to be considered for the Senior Technical Director position given to Ms. LaFaver in January 2007; (5) the alleged failure of Ms. LaFaver to consider Plaintiff for the Senior Technical Team Lead titles given to Mr. Jones and Ms. Crocheron in early 2007; and (6) any criticism of Plaintiff's work or re-assignment of her job responsibilities under Ms. LaFaver that occurred prior to August 2007.

> ### 2.    Many Actions Offensive To Plaintiff Are Not Adverse Employment Actions That Would Give Rise To A Retaliation Claim

Plaintiff's Complaint includes allegations of actions after August 2007 that Plaintiff claims were retaliatory adverse actions.  However, "[n]ot" everything in the workplace that makes an employee upset or resentful is necessarily 'adverse' or grounds for an actionable claim . . ." *Perez v. Theller*, 6th Dist. No. S-10-053, 2011-Ohio-2176, at ¶ 14 (App. Ct. 2011) (citing *Primes v. Reno*, 190 F.3d 765, 757 (6th Cir. 1999)).  As discussed above, an "adverse employment action" is "a materially adverse change in the terms and conditions of one's employment." *Cregget*, 2012 WL 3104508 at *3 (citing *White*, 364 F.3d at 797).  "Such a materially adverse action includes a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* "The employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citations omitted).

Under these standards, there is no dispute that the surplus of Plaintiff's position in June 2008, leading to the loss of her employment in August 2008, was an adverse employment action.

Similarly, Plaintiff would have experienced adverse employment action(s) to the extent that Plaintiff was rejected for positions to which she actually applied and was qualified for after August of 2007.

The formal and informal disciplinary measures and allocation of work responsibilities that occurred while Plaintiff reported to Ms. LaFaver do not, however, constitute adverse employment actions.  These events include, among other things: being told to prove leadership skills; the allocation of work that Plaintiff felt was beneath her; not being able to assign work to others; a late mid-year performance review; being asked to report arrival and departure times and daily work accomplishments; not being selected as a stand-in team lead; and not being picked for weekend work.  Each of these actions constitutes a *de minimis* act that courts have found do not rise to the level of an adverse employment action.  Even the formal Written Warning issued to plaintiff in October 2007, and the attempted PIP do not constitute adverse employment actions.  None of these events can be likened to being fired or demoted.  Nor did they result in a reduction in Plaintiff's pay, suspension, or a denial of benefits she otherwise would have received.

In *Cregget*, *supra*, the court examined several actions similar to those alleged by Plaintiff and held that they did not meet the standard for an adverse employment action. Some of the acts that the *Cregget* court rejected as adverse were a written reprimand, denial of professional training opportunities that were not a requirement of the job, being snubbed for a "temporary promotion" and being subjected to frequent classroom observations by a supervisor.  *Id.* at *2-5.  Plaintiff's similar allegations of adverse actions are likewise untenable.  Thus, the only two actions by AT&T that bear consideration as adverse employment actions in the context of Plaintiff's retaliation claim

24

are the surplus of her position, and potentially Plaintiff's failure to obtain a new position after

August 2007 for which she applied was qualified.[8]

### 3.    The Surplus Of Plaintiff's Position Does Not Give Rise To A Retaliation Claim

Although Plaintiff's surplus indisputably qualifies as an adverse employment action,

Plaintiff has not provided any evidence that the surplus was a form of retaliation.[9]  An employee's

protected activities will be the cause of an employer's retaliatory conduct only when the employer

knew of those protected activities.  *Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623,

628-629 (6th Cir. 2008).  There is no evidence that the persons responsible for the surplus of

---

[8]Plaintiff appears to claim that the PIP was an adverse employment action.  In *White v. Baxter Healthcare Corporation*, 533 F.3d 381 (6th Cir.2008), the Sixth Circuit explained that a negative performance evaluation may constitute an adverse employment action if the plaintiff can "point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." *Id.* at 402 (quoting *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 789 (6th Cir.2000)). The same rationale applies to performance improvement plans. If Plaintiff could point to an adverse employment action linked to the May 2008 PIP, there could be some evidence of an adverse action. But Plaintiff has not presented any such evidence. There is no indication that the PIP had any impact on her pay, benefits, or otherwise impacted her employment. Indeed, Plaintiff does not dispute that the May 2008 PIP was put on hold, without being implemented.

[9]It appears that Plaintiff assumes that her surplus and failure to obtain other positions for which she applied during her surplus period are due to retaliation simply because those events occurred after the filing of her Charge. Over seven months passed between the filing of Plaintiff's Charge on November 1, 2007, and her surplus in June 2008. Courts have found that such a gap in time fails to constitute sufficient temporal proximity to establish causation. *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (finding discipline that occurred two to five months after charges were filed insufficient to create a triable issue of retaliation). Moreover, "absent other direct or compelling circumstantial evidence, temporal proximity alone is insufficient to support a finding of causal connection." *McDermott v. Cont'l Airlines, Inc.*, No. 2:06-cv-0785, 2008 U.S. Dist. LEXIS 29831 at *13-14 (S.D. Ohio Apr. 11, 2008) citing *Cunningham v. Kroger Co.*, No. C-050990, 2006-Ohio-5900, ¶ 16, unreported, 2006 Ohio App. LEXIS 5844, at *14 (emphasis added). Beyond the chronological order of the events, there is not a shred of evidence to indicate that Plaintiff's surplus and failure to be selected for another position is causally linked to her earlier EEOC Charge.

Plaintiff's position had any knowledge of Plaintiff's protected activities. Neither Ms. LaFaver nor Ms. Maysey was involved in the surplus process.[10] The evidence instead is that the decision-making for the surplus that impacted Plaintiff's job was done by persons at the Vice President level, including Andre Fuestch and Guy Bevente. Plaintiff has not identified any evidence to show that these individuals had knowledge of Plaintiff's hotline complaints or her OCRC Charge. The absence of such evidence defeats Plaintiff's retaliation claim based on the surplus of her position. *Brown v. City of Franklin*, 430 Fed. Appx. 382, 386, 2011 WL 255878768 at **3 (6th Cir. June 28, 2011) ("one necessary element of the prima facie case is that the official committing the adverse action have knowledge of the protected activities").[11]

### 4. Plaintiff's Failure To Be Selected To Other Positions Does Not Give Rise To A Retaliation Claim

Plaintiff also claims that her failure to obtain positions such as Senior Technical Director, Senior Team Lead, or other open positions to which she applied was due to illegal retaliation.

---

[10]Plaintiff claims that "[c]ontrary to Defendant's assertion, Ms. LaFaver was involved in the Surplus process." (Opposition at p. 18). This claim is based on Plaintiff's "conspiracy theory" that Ms. LaFaver had Plaintiff's title changed from Project Manager to Business Manager as a way to set her up for surplus. (Opposition at p. 18). Plaintiff relies on her Exhibits 22 and 23, which are unauthenticated e-mail communications regarding the title change, as her "evidence." Plaintiff was not a party to these communications and did not authenticate them. Thus, they are not proper evidence, and the Court will not consider them. Even if the e-mail communications were proper evidence, there is no reference anywhere in the e-mail communications to the need or desire to make the title change due to an impending surplus. Plaintiff cites to her EEOC Charge form (Pl Ex 20) as purported support for her statement that "Defendants [sic] remedy was to change Ms. Thomas title to a 'Business Manager' in anticipation for aligning her to be included in the 'surplus.'" (Opposition at p. 18). Plaintiff does not even include such an allegation in the EEOC Charge and, even if she did, the allegations written in a charge form are not proof that any of the alleged events occurred.

[11]To the extend Plaintiff is relying on Ms. Baker's role in the surplus process to establish knowledge, the evidence indicates that Ms. Baker had no specific knowledge of Plaintiff's protected activity.

Plaintiff has not pointed to any evidence to support these allegations.  Indeed, Plaintiff does not identify which specific positions she claims she was denied as a result of retaliation, but instead makes a general, sweeping allegation that each position she was denied was the result of retaliation.

Plaintiff's failure to either identify specific instances of alleged retaliation, or point to the specific evidence that supports the alleged occurrences of retaliation, dooms her claim.  Rule 56 does not require a district court to sift through vague claims and a voluminous record to uncover a genuine issue of fact for trial.  Rather, it is Plaintiff's burden to bring the Court's attention to specific instances of wrongful conduct, and point to specific evidence on the record that tends to show that the conduct was indeed prohibited.  *Williamson*, 481 F.3d at 379-80.  Plaintiff here has not even attempted to meet this burden with respect to her retaliation claim.

Even assuming that Plaintiff had identified specific instances and evidence of retaliation, Plaintiff cannot demonstrate that the alleged retaliatory actors had knowledge of Plaintiff's protected activity.  In order for Plaintiff to establish that she was denied a position due to retaliation, at a minimum, Plaintiff would need to demonstrate that the hiring manager for the position had knowledge of her protected activity and rejected her on that basis, or that the hiring manager was other wise discouraged from hiring Plaintiff by persons with knowledge of Plaintiff's protected activity.  *Scot v. Eastman Chemical Co.*, No. 05-6079, 2008 WL 1808549 **14-15 (6th Cir. April 22, 2008).

Plaintiff does not even allege that this occurred, let alone present any evidence of it.  In fact, Plaintiff admits that she did not know any of the hiring managers for the positions she claims to have applied for, other than one Senior Technical Director position filled by Sandra Baker.

Baker selected Judith Greenwald for that position in July 2007, before Plaintiff engaged in any protected activity.

To conclude that Plaintiff was denied positions in retaliation for her protected activity in the absence of any evidence to suggest that the hiring managers knew of Plaintiff's protected activities would require rank speculation, which is not sufficient at the summary judgment stage. *Matushita Elec. Indus. Co.*, 475 U.S. at 586.

**5.**       **Plaintiff Cannot Establish The Causal Connection Requirement Of A Retaliation Claim**

Causation is shown when the evidence is "sufficient to raise the inference that protected activity was the likely reason or the diverse action." *Kurtz v. McHugh*, 423 Fed. Appx. 572, 578 (6th Cir. May 18, 2011) (citation omitted).  At this stage, Plaintiff must produce "sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had she not filed a discrimination action."  *Motley v. Ohio Civil Rights Comm'n.*, No. 07AP-923, 2008 Ohio 2306 (10th App. Dist. May 13, 2008).  "If the evidence indicates that an employer 'would have made the same employment decision regardless of the employee's participation in the protected activity, the employee cannot prevail.'" *Motley*, 2008 Ohio 2306 at ¶ 11; *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Plaintiff has not produced any evidence of a causal connection between either her hotline complaints or her OCRC Charge and any alleged adverse employment action.  Indeed, all of the evidence shows that discipline and criticism directed at Plaintiff was directly attributable to Plaintiff's poor performance, deceptiveness (particularly with respect to her claim that she was working at home, when it is undisputed that Plaintiff did not log into the company system during

28

the work day), and refusal to respond to communications.  Further, Ms. LaFaver's disciplinary efforts began before Plaintiff engaged in any protected activity.[12]

Likewise, all of the evidence indicates that Plaintiff's position would have been eliminated regardless of her protected activities.  The surplus process impacted 63 other positions within the company in addition to Plaintiff's position.  Moreover, at least six other employees from Ms. LaFaver's team had their positions eliminated within six months of the surplus of Plaintiff's job.  Plaintiff's 2007 review rating of "Below Expectations" made her vulnerable to having her position eliminated, because employees who were considered non-critical were rated lower in the surplus process.

Plaintiff has also failed to present evidence from which it could be inferred that she was denied other positions because of her Hotline complaints or the OCRC Charge.  As discussed, her allegations regarding failure to be hired for other positions are nonspecific and vague.  With the exception of the Senior Technical Director position selected by Sandra Baker, Plaintiff has not identified who made the decisions not to hire her, who had been selected for the position, or if, in fact, the positions had been filled at all.  These conclusory allegations are not enough to establish causation.  *See Allen v. Michigan Dept. Of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999) (a

---

[12]Plaintiff apparently assumed that once she contacted the Hotline and filed her OCRC Charge she no longer had to comply with requests from her supervisor when she did not like or agree with them.  However, Plaintiff's protected activities did not give her the right to pick and choose which job responsibilities to fulfill.  *See Booker v. Brown Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989) (an employee's complaint or charge does not create a right "to miss work, fail to perform assigned work, or leave work without notice") (citing *Brown v. Ralston Purina Co.*, 557 F.2d 570, 572 (6th Cir. 1977)).  In light of Plaintiff's behavior – failing to communicate with supervisors, failing to satisfactorily and timely perform assignments, and claiming to work from home when she was not logged into the company system – she cannot show that written warnings or poor performance reviews would not have taken place absent Plaintiff's protected activity.

plaintiff who failed to present any specific dates or incidents when he was denied promotion, but instead merely stated that he was not promoted to sergeant while non-black employees were promoted failed to establish a prima facie case of retaliation).

Additionally, Plaintiff's deposition testimony indicates that Plaintiff was applying for positions for which she did not meet the stated qualifications, or even understand what was meant by the stated qualifications.  For example, Plaintiff applied for a job in "enterprise architecture,' which required either a Ph.D. degree with four years relevant architecture experience or a Master's decree with six years architecture experience.  When asked whether she had such experience, Plaintiff responded that she "would need architecture experience to be explained to [her] once [she] got to the interview."  She admitted that she did not specifically know what the job posting meant by architectural experience even though she applied for it.

Plaintiff's testimony indicates that she expected to receive interviews for positions where she only possessed 51% of the required skills or experience, and such skills or experience might be based only on random experiences she had in her personal life.  To illustrate, one of the "director" positions Plaintiff applied for was a position as an associate director of patent development. Plaintiff testified that she had patent experience and qualified as "an experienced inventor" based on one occasion of having tried, unsuccessfully, to obtain a patent relating to a process on how to manufacture food.

Thus, the evidence demonstrates both that Plaintiff would not have been selected for other positions to which she applied regardless of her protected activity, and that AT&T had legitimate, non-retaliatory reasons for not hiring Plaintiff for other positions.  Plaintiff simply did not possess the basic qualifications for the positions.

Plaintiff has not presented any evidence to support her retaliatory failure-to-hire allegations.  AT&T is entitled to summary judgment on these claims.

## IV.  CONCLUSION

For all of the foregoing reasons, AT&T's Motion for Summary Judgment (ECF #29) is GRANTED.

**IT IS SO ORDERED.**

<div style="margin-left:50%">

s/Donald C. Nugent
**DONALD C. NUGENT**
**UNITED STATES DISTRICT JUDGE**

</div>

**DATED:** March 20, 2013

<div align="center">31</div>